[Civ. No. 22361.   Second Dist., Div. Three.   May 8, 1958.]

HAROLD J. THOMAS, Appellant, v. SUMMERS GYROSCOPE COMPANY (a Corporation) et al., Respondents.

Clark, Trau & Langworthy, Howard M. Langworthy and William Douglas Sellers for Appellant.

Frank P. Doherty for Respondents.

WOOD (Parker), J.—Plaintiff, as an owner of stock in the defendant Summers Gyroscope Company (a corporation), commenced this stockholder's derivative action for the benefit of the corporation, and on behalf of himself and the other stockholders. The defendants answered the complaint. The defendants (except defendant Kranz) made a motion that the plaintiff be required to furnish security as provided in section 834 of the Corporations Code. Affidavits in support of, and in opposition to, the motion were filed. Plaintiff requested permission to present oral evidence in addition to the affidavits. Oral evidence was presented by plaintiff and defendants. The court adjudged, among other things, that there is no reasonable probability that the prosecution of any of the causes of action will benefit the defendant corporation or its security holders. The court ordered that plaintiff furnish security in the aggregate amount of $31,000 within a specified time. The plaintiff failed to furnish the security within that time and, upon motion of defendants, the action was dismissed. Plaintiff appeals from the judgment of dismissal.

Appellant contends that there was no substantial evidence to support the trial court's ruling with respect to "Demands 2 and 14, Counts 1 and 6." There were five causes of action in the original complaint, filed December 2, 1955. In June, 1956, the complaint was amended to include a sixth cause of action. No contention is made on appeal as to causes of action 2, 3, 4, and 5.

Section 834 of the Corporations Code provides, in part: ". . . (b) In any such action [stockholder's derivative action] . . . the corporation or such defendant may move the court for an order, upon notice and hearing, requiring the plaintiff to furnish security as hereinafter provided. Such motion may be based upon one or more of the following grounds:

(1) That there is no reasonable probability that the prosecution of the cause of action . . . will benefit the corporation or its security holders; . . . At the hearing upon such motion, the court shall consider such evidence, written or oral, by witnesses or affidavit . . . . If the court determines . . . that the moving party has established a probability in support of any of the grounds upon which the motion is based, the court shall fix the nature and amount of security to be furnished by the plaintiff . . . If the court . . . makes a determination that security shall be furnished . . . the action shall be dismissed . . . unless the security required by the court shall have been furnished within such reasonable time as may be fixed by the court."

Prior to the incorporation of Summers Gyroscope Company in January, 1946, Thomas O. Summers, Jr., who was an inventor of aircraft, gyroscopic, and navigational instruments, was conducting a manufacturing business, owned by him, known as Summers Instrument Company. He was the owner of patents pertaining to such instruments. He had about 14 employees in the business, and he had completed government contracts amounting to more than $100,000 during "the present year" preceding the formation of the corporation. At the time the present action was commenced there were about 700 employees, and the corporation had done a gross business of approximately $23,000,000 during the 10 years of its existence. The 10 original stockholders of the corporation were Mr. Summers and persons (including plaintiff Mr. Thomas) who were associated in some manner with him in the Summers Instrument Company. The assets of the Summers Instrument Company were sold by Mr. Summers to the corporation, Summers Gyroscope Company; and Mr. Summers granted to the corporation the exclusive license to use all his inventions for 20 years. Mr. Summers received 60,000 shares of stock of the corporation.

The first cause of action included allegations, as follows: that as consideration for the 60,000 shares of stock Mr. Summers entered into a license agreement with the corporation on April 17, 1946, whereby he granted to the corporation for 20 years the exclusive license on all his inventions, then or thereafter, owned by him, and the corporation agreed to pay him a license fee (royalty) of 1 per cent "upon all products made embodying license *inventions*"; that on May 3, 1946, the directors, for the purpose of increasing the amount of money taken by Mr. Summers from the corporation, above

his salary of $500 a month and the royalty of 1 per cent under the license agreement of April 17, 1946 (1 per cent on products made by use of inventions), proposed that Mr. Summers be given additional consideration, and it was agreed that, in consideration of a waiver by Mr. Summers of the royalty of 1 per cent under the license agreement, the corporation should pay him, in addition to his regular salary, 1 per cent of the *gross amount of money received* from the corporation's business transactions; that prior to February 2, 1953, for the purpose of further increasing the amount of money received by Mr. Summers from the corporation, and at a time when he was receiving a salary of $15,000 or $25,000 a year, the directors and Mr. Summers entered into the execution of a plan for the purpose of giving him a greater share of the corporation income and to deprive the shareholders of their rights therein; the plan included the cancellation of the exclusive license agreement of April 17, 1946, under which Summers was to receive 1 per cent royalty on products made by use of inventions (which royalty was waived during the time 1 per cent of the *gross sales* was being paid), and the plan included the substitution of a new agreement by which Summers would receive a royalty of 3 per cent, instead of 1 per cent, on the gross sales of the corporation's products; a further purpose of the plan was to deprive the corporation of its ownership rights in the patents and to return the ownership of the patents to Summers without any consideration from him; the corporation and Summers entered into an agreement on February 2, 1953, whereby they cancelled the license agreement of April 17, 1946; pursuant to said plan and conspiracy the corporation and Summers entered into another agreement on February 2, 1953, entitled "Patent Agreement for Executive Officers," for the purpose of paying Summers 3 per cent of the gross sales, instead of 1 per cent royalty on the products made by use of the patents; in further execution of the plan the corporation and Summers, on August 3, 1953, entered into an agreement whereby Summers purported to sell to the corporation two patents in which the corporation already had exclusive rights under the agreement of April 17, 1946; after the execution of the agreement of August 3, 1953, Summers received a royalty of 3 per cent in addition to the 1 per cent of the gross amount received by the corporation; the individual defendants in violation of their fiduciary obligations made use of their power of management for the personal gain of Summers to the injury of the

shareholders; the purported agreements of February 2 and August 3, 1953, should be rescinded and the license agreement of April 17, 1946, should be reactivated; that the money made by the corporation has been diverted so that the corporation has not at any time made a dividend payment, while during that time Summers has received grossly excessive payments, including salary, a commission of 1 per cent of the gross sales of the corporation, and (since August 3, 1953) a royalty of 3 per cent of the selling price of the corporation's products, which payments to Summers have totaled in excess of $175,000 a year since 1953; the facts alleged were unknown to plaintiff until they were discovered by his attorney in preparing for this action.

The sixth cause of action (amendment to complaint) included allegations, as follows: on February 12, 1946, Summers presented to the directors an inventory of the assets of the Summers Instrument Company, and he then offered to assign to the corporation all of said assets, subject to liabilities, together with certain patents and applications for patents, and he represented that the assets and inventory, less the liabilities, had a net value in excess of $60,000; the board accepted the offer, and no determination was made by the board of the value of the assets; on April 6, 1946, the corporation filed an application with the Corporation Commissioner for permission to issue and sell shares of stock; in the application it was represented that the corporation would acquire from Summers, doing business as Summers Instrument Company, "[all of the assets of the Summers Instrument Company, of which Thomas O. Summers, Jr., is sole owner], including certain Letters Patent, designs, engineering drawings, blueprints, dies, lathes, milling machines, etc.," and said application included a balance sheet; one of the items of the balance sheet was entitled "Inventories" and it comprised two items, namely, raw materials, and work in process; the value of those items, according to the sheet, was $66,654.27; the actual cost of those items was $5,995.34 and not $66,654.27, a difference of $60,659.03; said amount of $66,654.27 was not the fair market value of the inventory but was a figment of the imagination of Summers; the directors failed to check the alleged valuation by use of an independent appraiser or otherwise, and instead the directors adopted a resolution to purchase the assets from Summers; as a result of the action of the directors and their failure to obtain an appraisal by expert appraisers, the corporation did not receive adequate consid-

eration for the shares of stock issued to Summers; said acts of defendants were in violation of their fiduciary obligations as directors, and those acts were for the personal gain of Summers to deprive the shareholders of their rights; said facts were unknown to plaintiff until they were discovered by his attorney in preparing for this action; that promptly upon discovering the facts plaintiff made demand upon the corporation, under section 834 of the Corporations Code, by sending the demand to Summers, as president; defendants refused to comply with the demand; about August 1, 1955, the corporation declared a stock dividend of 150 per cent; as a result of that dividend, Summers received 90,000 shares of the corporation stock, based upon his then title to 60,000 shares wrongfully obtained as above alleged; since Summers was not entitled to said 60,000 shares, because of his failure to provide consideration therefor, he was not entitled to any benefit therefrom including the 150 per cent stock dividend; Summers should be required to return the 90,000 shares and the 60,000 shares to the corporation.

Appellant argues, with respect to the first cause of action, that since the license agreement of April 17, 1946, was cancelled on February 2, 1953, Summers was not in a position thereafter to waive the royalty payment of 1 per cent provided for in that agreement, and since Summers was entitled to 1 per cent of the gross sales only during the time he waived the royalty of 1 per cent, he was not entitled to 1 per cent of the gross sales after February 2, 1953, when the royalty agreement was cancelled. They argue further that if Summers insisted on taking 1 per cent of the gross sales, he was not entitled to the 3 per cent of the gross sales which was paid after August 3, 1953; that if the corporation bought the patents on August 3 it should not pay a license fee thereafter for the use of its own patents or pay a fee in lieu of a license fee.

Appellant argues, with respect to the sixth cause of action, that there was no acceptable evidence that the inventory of the Summers Instrument Company had a value of $66,654.27; that since Summers had paid less than $6,000 ($5,995.24) for the things (war surplus material) listed in the inventory, and since no impartial appraisal was made of those things, the inventory value was inflated; that "if the inflated value of the inventory be reduced from $66,654.27 to $5,995.24 that the net worth of the Summers Instrument Company is reduced from $60,000.00 to a negative $659.03 and Mr. Summers is

seen to have turned in no consideration for the 60,000 shares of stock issued to him on the basis of a fictitious $60,000.00 net worth.''

Defendants filed nine affidavits in support of the motion to require plaintiff to furnish security. Five of the persons who made affidavits, and five persons who did not make affidavits, were called as witnesses by the plaintiff. Some of the affidavits are long and include many details. The oral testimony, including the discussions made in connection therewith, comprise 810 pages of reporter's transcript.

There was evidence on behalf of defendants that Summers waived, and did not receive, 1 per cent royalty on invention products while he was being paid 1 per cent on gross sales.

With respect to the cancellation of the license agreement (which provided for 1 per cent royalty on inventions), Mr. Odell McConnell, who was one of the organizers of the corporation and had been a director and the general counsel for many years (until April, 1956), stated in his affidavit and also testified, in part, as follows: the provision in the license agreement that the corporation might assign the right to use the inventions without the consent of Summers was inadvertently placed therein; it was intended that the corporation should not have the right to assign such rights without the consent of Summers; there was never any plan or suggestion that the corporation would assign or sublet any of the patents without the consent of Summers; in 1946 when the corporation was beginning and there was no assurance of success, it would have been unfair to Summers for the corporation to have the right to assign or sublet the right to use the inventions without the consent of Summers; after the corporation had expanded rapidly and there were many employees, he (witness) was of the opinion that the license agreement should be modified; that in his opinion the corporation should have more control over the patents and it was bad public relations and an unwise policy for the corporation to give Summers the right to have assigned to him all the inventions of the employees of the corporation; under the license agreement, it was more difficult to obtain financing; that it was against the interest of the business, if in case of bankruptcy, the patents should go to Summers; these were the cardinal reasons the directors cancelled the license agreement and entered into the Patent Agreement for Executive Officers (under which Summers received 3 per cent of the amount of sales).

With respect to the cancellation of the license agreement, Mr. Geague, a patent attorney, stated in his affidavit and also testified that it was his advice to the corporation that the license agreement be cancelled and that a substitute plan be entered into; he objected to the license agreement because it provided in effect that all inventions by employees and others connected with the corporation should be assigned to Summers; such provision would tend to destroy the initiative and incentive of the employees to invent and improve inventions; he (witness) submitted to the corporation a proposed agreement which he thought should be substituted in place of the license agreement; the final draft of the agreement (dated February 2, 1953) is in two parts—one of which is the agreement to cancel the license agreement, and the other is the Patent Agreement for Executive Officers; those were the agreements entered into as of the date of February 2, 1953; the advantages for the corporation by reason of the Patent Agreement for Executive Officers are that (1) all inventions of the employees became the property of the corporation, (2) the corporation was given the option to purchase the inventions of employees, and (3) upon the exercise of the option, the corporation became the owner and was not a licensee; he (witness) drafted the agreement of August 3, 1953, whereby Summers assigned two patents to the corporation, but he (witness) did not determine the 3 per cent of the sales price, as set forth in the agreement; the 3 per cent matter was determined by Mr. Stotsenberg, a certified public accountant.

One of the patents which was assigned to the corporation by Summers, under the agreement of August 3, was sold to the Garrett Corporation for $350,000.

Mr. Jawetz, a partner in the stockbroker firm of Daniel Reeves & Company, stated in his affidavit that in his opinion 3 per cent of the gross sales price of an item covered by a patent is a reasonable price to be paid for a patent.

Mr. Summers, president of the corporation, testified that when he transferred the Summers Instrument Company as "a package deal" to the Summers Gyroscope Company, he agreed to give the corporation a license to use his patents, but he insisted on having a provision in the agreement that no assignment of the patent rights should be assigned without his consent; he insisted on that provision because he had no assurance that the company would not go bankrupt and he felt that if it went bankrupt he should have his patents; such

a provision was beneficial to the corporation at the beginning of its operations when all the inventions had been made by him, but later when there were several hundred employees, and other persons started to make inventions, it was not a good provision for the corporation; the other employees did not like the idea of their inventions being assigned to the president of the corporation, and brokerage firms did not want to sell the corporation's stock if the corporation had a license agreement whereby in the event of reorganization, the patents would revert to Summers; the sale of the patent to Garrett Corporation for $350,000 would not have been possible under the old license agreement because he would not have consented to the sale; he was not enthusiastic about the sale to Garrett, but the board of directors overruled him and virtually forced him to sell his patents.

With respect to the consideration for the 60,000 shares issued to Summers it is to be noted (1) that plaintiff alleged in the first cause of action that the consideration was the license agreement of April 17, 1946, pertaining to all of Summers' inventions and the payment of 1 per cent of the sale of products which were made by use of the inventions; and (2) that the plaintiff alleged in the sixth cause of action that the consideration consisted of an inventory of assets of the Summers Instrument Company (war surplus material), less liabilities, together with patents.

In the application for a permit to issue certificates of stock, it was stated that the corporation would acquire from Summers Instrument Company all the assets, including letters patent, designs, engineering drawings, blueprints, patterns, dies, lathes, milling machines, machine tools, inventory of stock, contracts, orders, and all business now conducted by Summers including good will. It was also stated therein that the corporation would obtain from Summers an exclusive license agreement for the manufacture and sale of all products containing any and all of the inventions.

The permit for issuance of certificates of stock stated that the corporation was authorized to sell and issue to Summers not to exceed 60,000 shares as consideration for the assignment and transfer of the business and assets described in the application for a permit.

Mr. McConnell stated in his affidavit and also testified that in 1945 and 1946 he did not have expert detailed information respecting the exact character of the inventory of the war surplus material, but from his knowledge of the business and

activities of the Summers Instrument Company and of Summers, he (witness) had sufficient knowledge to cause him to believe that the material was of a very substantial monetary value; he paid $10,000 cash for 10,000 shares of the stock; the original board of directors consisted of Thomas O. Summers, Jr., president; Odell S. McConnell, vice-president; and Dorothy Lindt (now Dorothy Barton), secretary and treasurer; at the first meeting of the board, a resolution was adopted authorizing the application for a permit to sell and issue shares of its common stock of the par value of $1.00 per share as follows: "To Thomas O. Summers, Jr., 60,000 shares in consideration of the sale and assignment by Summers to the corporation of all the business and assets subject to the liabilities of the Summers Instrument Company; . . . To Harold J. Thomas [plaintiff herein], 6,000 shares in consideration of payment to the corporation of $6,000 cash . . .''; at the time of entering into the agreement with Summers, he (witness) was of the opinion, and he is now of the opinion, that the assets of the Summers Instrument Company were of the fair value of a sum substantially in excess of $60,000 as of that date; that from his discussions with Summers and other persons connected with the instrument company, he considered that Summers was of the belief and conviction that the value of the assets of the instrument company was greatly in excess of $60,000; the transaction between Summers and the corporation was a single transaction, and it was not made up of separate units; the transaction was that Summers would transfer to the corporation, subject to liabilities, the assets of the instrument company, its going business, its contracts, and would enter into the license agreement with the corporation; that plaintiff (Mr. Thomas) knew for 10 years that the 60,000 shares of stock were issued to Summers for such consideration, and plaintiff knew that substantially all the production of the corporation was based solely on the inventions and patents of Summers; plaintiff was employed on a fee basis by the instrument company prior to 1946, and he continued as chief draftsman of the corporation until the severance of his connection with the corporation in 1953.

Manny Cohen stated in his affidavit that he sold the war surplus material to the Summers Instrument Company in 1945 and in January, 1946; the material included gyro motors, magnet assemblies, rotor assemblies, commutator lamination assemblies, and the like; when he purchased that material from the Schwein Engineering Company, he received from

that company a typed inventory showing the part numbers and their costs which was in excess of $300,000; at the end of the war in 1945 the government began terminating many production contracts, and at that time there was a lull in the general trading in surplus material because no one knew how much surplus material would be worth; after he had sold the material to the instrument company he had many inquiries for such material but he had no further supply of it.

Mr. Clark stated in his affidavit and also testified that he was employed by the instrument company prior to the incorporation; he has been employed by the corporation since February, 1946, except for two short periods of time; at the time the instrument company acquired the surplus material he helped inspect, unload, and count the material; he prepared a schedule setting forth the material acquired, and in that schedule he set forth the value of each unit as it appeared in the inventory of the Schwein Engineering Company; the schedule indicates that the total material transferred to the corporation had a value of $228,083.96; also shown on the schedule was a list of materials actually used by the corporation in the production by the corporation, and as indicated in the schedule the value of such material was $160,154.88; a balancing machine, which was included in the schedule, would cost the corporation approximately $7,000 in the open market; as a result of the corporation having this material, it was not necessary to go to the expense of tooling or designing; among his duties as plant manager for the corporation, he was responsible for going into the open market and purchasing material similar to the surplus material; from his experience in such purchases, he is of the opinion that the market price per unit as set forth in the schedule represents the reasonable market value of said material.

Mr. McConnell testified that war surplus material is sometimes sold for a fraction of its true value.

Mr. Summers testified that he sold all the assets of the instrument company to the corporation, which included all the contracts with the government, all drawings, designs, tooling, machinery, the right to use all his inventions, and the good will; he gave the corporation "a complete package" for 60,000 shares of the corporation; the only appraisals that were made were made by the various persons who were purchasing stock, and they looked at the inventory, equipment, and products, and they satisfied themselves; plaintiff, who was one of them and was Summers' best friend then, helped in

judging the value; plaintiff had worked for Summers as an engineer at the American Telephone Company; he (witness) paid approximately $6,000 for the surplus material.

Mr. Jawetz, the stockbroker above referred to, testified that his investigation showed that the corporation reinvested in the business practically all of its earnings and profits; a company of that type is known as a "growth company"; such a company is one that continually reinvests its earnings in order to expand and develop new products; the interest of Daniel Reeves & Company in the corporation was that it was a growth company; in effecting a distribution of the stock Daniel Reeves & Company advised its customers not to expect a dividend for at least five years.

The corporation declared and paid a stock dividend of 150 per cent in August, 1955, and plaintiff received such dividend. After the dividend was paid, plaintiff was the owner of 15,000 shares of stock.

There was evidence that the selling price of the stock ranged from $2.00 to $3.00 a share in April, May, June, and July, 1956.

There was evidence that the compensation paid to Summers during the years 1949, 1950, 1951 and 1952, was as follows: $12,276.06; $21,958.79; $52,214.40; and $49,411.78. In 1953 and 1954, his compensation was as follows: $93,923.34 and $113,390.33.

The amount of gross sales in 1956 was $5,740,945.

Practically all the products sold by the corporation were made by using the inventions of Mr. Summers.

There was substantial evidence that the board of directors was faithful to the corporation, acted in the best interests of the corporation, and used reasonable business judgment in the exercise of its discretionary powers. There was no evidence of any fraudulent conduct on the part of the board. The evidence amply supports the ruling of the trial court that there is no reasonable probability that the prosecution of any of the causes of action will benefit the defendant corporation or its security holders. Some rules which are applicable here, regarding the rights of a minority stockholder in a derivative action and regarding the control of the corporate affairs by the board of directors, are stated in *Findley* v. *Garrett,* 109 Cal.App.2d 166, 174-178 [240 P.2d 421].

Appellant contends further that the amount of security required was unreasonably high. He argues that there

was no definite showing as to the time defense counsel had spent or as to the value of the time. The attorney for defendants (except defendant Kranz) stated that he had spent about two months on matters pertaining to the case. Mr. McConnell and Mr. Dustin stated in affidavits that they believed that $3,000 each was a reasonable charge to be made by their counsel for his services in their defense. The pleadings and affidavits are long. There are many exhibits. In the present preliminary matter, pertaining to security, oral evidence was presented over a period of six days. It is apparent that a trial of the case, involving a corporation that transacted a large volume of business during the past 10 years, will require extensive preparation and many days of trial. The trial judge did not err in determining the amount of security to be furnished.

The judgment is affirmed.

Shinn, P. J., and Vallée, J., concurred.